John M. Hickerson v. Commissioner.
Hickerson v. Commissioner
Docket No. 47261.
United States Tax Court
T.C. Memo 1954-237; 1954 Tax Ct. Memo LEXIS 8; 13 T.C.M. (CCH) 1180; T.C.M. (RIA) 54343; December 29, 1954, Filed John M. Hickerson, 16 Wayside Lane, Scarsdale, N. Y., pro se. Maurice E. Stark, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent determined a deficiency of $2,829.09 in the petitioner's income tax for 1944. The question for determination is whether the respondent erred in determining that an amount of $29,025.87 composed of advances made to a corporation of which petitioner was president and sole stockholder constituted a nonbusiness bad debt and was deductible as such by petitioner in 1944. Findings of Fact A portion of the facts have been stipulated and are found accordingly. During 1944 the petitioner was a resident of Scarsdale, New York. He filed his income tax return for that year with the collector *9 for the third district of New York. About October 1, 1929, the petitioner entered the employ of Lord & Thomas, a corporation, New York, New York, which operated an advertising agency. In his employment with Lord & Thomas the petitioner worked on accounts for national advertising and did some copywriting. He was on duty during office hours on Mondays through Fridays and on Saturday mornings. He was also on duty many nights and sometimes on Sundays. The petitioner continued in the employment of Lord & Thomas until early in 1939 when he organized J. M. Hickerson, Inc., sometimes hereinafter referred to as Hickerson, Inc. Upon the organization of Hickerson, Inc., petitioner became, and has continued to be, its sole stockholder and president. From its inception, Hickerson, Inc., has been engaged in business as an advertising agency. In June 1928 the petitioner and T. F. McDonald of Cleveland, Ohio, purchased all the capital stock of Brownsville Publishing Company, sometimes hereinafter referred to as Brownsville. During the same month the petitioner was elected president and director of the corporation and entered upon duty as its chief executive officer. Brownsville published two daily *10 newspapers, The Morning Telegraph and The Brownsville Evening Telegraph, in Brownsville, Pennsylvania. The corporation had been mismanaged and was having financial difficulties at that time. In September 1928 John E. Tilton was employed as editor for the papers. In the performance of his duties as chief executive officer of Brownsville, petitioner visited its place of business about twice monthly and otherwise kept in contact with the business by letter, telegram and telephone. After Tilton's employment, petitioner made recommendations to him respecting the conduct and management of the business. Petitioner also assisted in obtaining local and national advertising, obtained credit for the corporation from those who supplied it with materials, and helped obtain loans to the corporation as and when they were needed. Brownsville purchased Mardorff Printing Company of Brownsville, Pennsylvania, in 1930; purchased the assets and good will of the California (Pennsylvania) Sentinel (a weekly newspaper) in 1934 and promoted the circulation of that paper in its local area; purchased the assets and good will of a weekly newspaper in Belle Vernon, Pennsylvania, in 1935 and promoted the circulation *11 of the paper in its local area; and in 1938 purchased stock in a corporation which published the Aliquippa Gazette (a weekly newspaper) in Aliquippa, Pennsylvania. At a meeting of the board of directors of Brownsville on February 27, 1937, the petitioner stated that thereafter he would be unable to help Tilton by writing promotion articles, suggesting new ideas, etc., and felt that he should no longer receive a salary as president of the corporation. Thereupon a resolution to discontinue his salary as president, effective March 1, 1937, was adopted. A further resolution providing for the payment of a fee to directors of the corporation for attending meetings of the directors was also adopted. Petitioner continued as president of Brownsville until about 1939 and as a director until sometime subsequent to February 18, 1941. On or about February 27, 1934, A. E. Hickerson, a brother of petitioner, and certain "associates," not otherwise identified by the record, acquired a majority of the shares of the capital stock of Philadelphia Suburban Newspapers, Inc., sometimes hereinafter referred to as Philadelphia. Money and credit of Brownsville were used in the acquisition of the stock. *12 On February 27, 1934, the petitioner was elected president and director of Philadelphia. In 1934 Philadelphia published two daily newspapers, The Main Line Daily Times and Upper Darby Chronicle, in Ardmore, Pennsylvania. Subsequent to the above-mentioned acquisition of stock, those newspapers were changed from daily to weekly newspapers. As president of Philadelphia, petitioner visited its place of business from time to time and engaged in various activities and projects of the corporation, including the preparation and sale of advertising, the preparation of sales letters, participation in the organization of a week-end school for Philadelphia's advertising salesmen and participation in negotiations with the printers' union which was attempting to unionize the employees of Philadelphia. On some undisclosed date prior to February 27, 1937, Brownsville acquired 2,730 shares of the capital stock of Philadelphia. At a meeting of Brownsville's directors on February 27, 1937, the sale of the stock to an undisclosed party was authorized. At a meeting of the board of directors of Philadelphia held on February 27, 1937, the petitioner stated that while he had done considerable work for *13 the corporation during 1936 for which he had received a salary, he had been unable to do much, if any, work for it since the first of 1937 and would be unable to do any work for it during the remainder of 1937 and that, accordingly, he did not feel that he should receive any salary from the corporation for the year. The petitioner's position was approved by the board as was a resolution that the directors be paid a fee by the corporation for attendance upon directors' meetings. Petitioner continued to serve as president of Philadelphia until February 20, 1939, and as director until July 1940. On March 22, 1941, petitioner sold the stock he owned in Brownsville and in Philadelphia. Subsequently, and on September 13, 1941, petitioner purchased from Frederick T. Gelder all (200 shares) of the capital stock of The Pioneer Press, Inc., sometimes hereinafter referred to as Pioneer, which published a daily newspaper known as The Carbondale Leader, in Carbondale, Pennsylvania. The purchase price of the stock was $25,000, payable $3,250 cash, $18,000 represented by 24 interest-bearing notes for $750 each, dated September 13, 1941, and due, respectively, quarterly over a period beginning *14 on September 13, 1942, and extending to June 13, 1948, and a further interest-bearing note for $3,750 due September 13, 1948. In connection with the transaction Pioneer, apparently as payment for an indebtedness owing by it to Gelder, executed to Gelder three interest-bearing notes for $2,500 each, dated September 13, 1941, and due on September 13, 1944, September 13, 1946 and September 13, 1948, respectively. As between petitioner and Gelder the notes of Pioneer were to constitute first and prior obligations of Pioneer. Also in connection with the transaction Pioneer transferred to Gelder all its accounts receivable, and in consideration therefor Gelder assumed and agreed to pay all of Pioneer's accounts payable other than the above-mentioned three notes of Pioneer. As a consequence of the foregoing, Pioneer's balance sheet at the close of September 13, 1941, disclosed the following: ASSETS
Machinery, equipment and other
personal property
$32,500
$32,500
LIABILITIES
Notes payable
$ 7,500
Capital stock
25,000
$32,500
Following petitioner's purchase of Pioneer's stock, Gelder held it as security for the payment of the notes of the petitioner and *15 of Pioneer. However, petitioner could vote 195 shares of the stock as long as there was no default in the payment of principal and interest on the notes. Gelder retained the right to vote the remaining five shares during the time payments were being made on the notes. Until the notes of petitioner and Pioneer were paid in full with interest, any new stock issued by Pioneer was to be held by Gelder as security for the payment of such notes. Except with the written consent of Gelder, no machinery, equipment or other personal property of Pioneer could be sold, encumbered, or removed from Carbondale, Pennsylvania, and Pioneer could not assign, lease, sell, or sublet its plant until the notes of petitioner and Pioneer had been paid in full. About the time petitioner purchased the stock of Pioneer he advertised for a publisher for the corporation and subsequently one was employed. Petitioner became president, treasurer and director of Pioneer, usually visited its place of business once a week, and at other times contacted its staff by correspondence and telephone. He participated in various activities of the corporation, including the organization of advertising campaigns and calling on *16 local advertisers and customers. During the period September 13, 1941 through September 8, 1944, the petitioner made advances to Pioneer as follows for working capital: 1941
$ 7,500
1942
10,050
1943
4,375
1944
2,835
Total
$24,760
Of the advances made in 1941, $5,000 was advanced on September 13, the day on which petitioner purchased the stock of Pioneer. In addition to the foregoing advances, Hickerson, Inc., during 1941 and 1942 furnished to Pioneer a total of $5,850, which currently was entered on the books of Hickerson, Inc., as accounts receivable owing to it by Pioneer. Under date of June 15, 1943, an entry was made on the books of Hickerson, Inc., closing the accounts receivable account carried for Pioneer and transferring the indebtedness of $5,850 to a loan account carried by Hickerson, Inc., for petitioner. In 1943, petitioner made payment to Hickerson, Inc., of part of the $5,850 and in 1944 completed payment in full. When the advances first began to be made to Pioneer, petitioner informed Pioneer's secretary and bookkeeper that they were to be repaid and were loans and were to be so recorded on the books of Pioneer. Pioneer gave no notes *17 nor any security for the advances and paid no interest with respect thereto. For the first few months following the petitioner's purchase of its stock, Pioneer's operations were profitable. However, Carbondale, Pennsylvania, was not a "war boom town" during World War II. Many people left it to engage in defense work, and as a consequence there was a substantial decrease in its population. Shortly after the beginning of 1942 Pioneer began to operate at a loss and thereafter continued to do so. In December 1943 it suspended publication of its newspaper. Pioneer's balance sheet at the close of 1943 showed assets of approximately $22,600 and liabilities (other than capital stock) of approximately $50,900, or a deficiency in assets of about $28,300. On June 1, 1942, petitioner purchased The Bethesda Journal and the assets employed in its operation. The Bethesda Journal was a weekly newspaper published in Bethesda, Maryland. Immediately following the purchase, the petitioner employed Mrs. J. Reed Bradley as editor and Wade Wells as advertising manager. During the period June through December 1942, the petitioner visited the office of the paper about once a week. He engaged in various *18 activities of the newspaper, including the formulation of a "better business" plan, preparing circulation letters and negotiating for advertising. Petitioner's purchase of The Bethesda Journal was made for the purpose of acquiring a newspaper which could be used as an aid to the advertising business of Hickerson, Inc. In October 1942, Hickerson, Inc., advertised that it could offer a test market basis for newspaper advertising because of its connections with Pioneer and The Bethesda Journal. Hickerson, Inc., obtained some business as a result of such advertising. In his income tax return for 1943 the petitioner took a deduction of $22,500 as a business bad debt arising from the amounts advanced to Pioneer during that and prior years. During September 1944 the petitioner sold his stock in Pioneer and in connection therewith he and Hickerson, Inc., respectively, executed to Pioneer general releases from any claims they had against it. In his original income tax return for 1944 the petitioner reported a long-term capital loss of $22,250 from the sale of the stock. He also took a deduction of $6,525.89 as a business bad debt representing the undeducted portion of loans totaling $29,025.87 *19 made to Pioneer during the years 1941 through 1944. Upon an audit of the petitioner's income tax return for 1943, the respondent disallowed the above-mentioned bad debt deduction of $22,500 and determined a deficiency in tax with respect thereto. No petition was filed with respect to that determination of the respondent. However, petitioner filed an amended income tax return for 1944 in which he took a deduction of $29,025.87 as a business bad debt arising from loans of that amount made to Pioneer during the years 1941 through 1944. In determining the deficiency here in controversy, the respondent determined: "that the advances of $29,025.87 to Pioneer Press, Inc. claimed as a bad debt deduction in 1944, constituted a non-business bad debt to be taken into account as a short-term capital loss under Section 117(d) of the Internal Revenue Code." Opinion In amendments to his answer, the respondent alleges that the advances of $29,025.87, for which deduction was taken in the petitioner's amended return for 1944, were made to Pioneer by Hickerson, Inc., and represented an indebtedness owing by Pioneer to that corporation and that, accordingly, petitioner was *20 not entitled to any deduction in 1944 either as a business or nonbusiness bad debt on account of such advances. In the alternative, respondent alleges that the advances were in part payment by petitioner of the purchase price of his stock in Pioneer or were contributions by petitioner to Pioneer's capital and that, consequently, petitioner was not entitled to any deduction in 1944 either as a business or nonbusiness bad debt on account of the advances. Petitioner contends that the advances were loans made by him to Pioneer. In making his determination of the deficiency here in controversy, the respondent determined that the advances in question were indebtedness owing by Pioneer to the petitioner and that it became bad in 1944. The respondent has the burden of proof as to the matters raised by the amendments to his answer. To sustain the position taken by him in such amendments, we would have to find from the record that the respondent erred in making the foregoing determinations for the reason that in fact the advances represented indebtedness owing by Pioneer to Hickerson, Inc., or were in part payment by petitioner for the purchase price of his stock, or were contributions by *21 petitioner to the capital of Pioneer. From a consideration of the record, we can not find that respondent has discharged his burden of showing that his determination was erroneous and that either the principal or the alternative positions taken in the amendments to his answer should be sustained. Taking the position that from 1928 through 1944 he was engaged in a business of his own, consisting of the promotion and financing of run-down newspapers, the petitioner contends that the $29,025.87 in controversy represented an indebtedness arising in his conduct of such business, that it was a business indebtedness proximately related to the business carried on by him in 1944 and was therefore deductible by him as a business bad debt. The respondent contends that during 1944 the petitioner was not engaged in any trade or business to which the indebtedness proximately related. A determination of the question presented by the contention of the parties turns solely on a decision as to whether or not the petitioner was engaged in a trade or business of his own in 1944 to which the indebtedness in question proximately related. Charles G. Berwind, 20 T.C. 808; affd. 211 Fed. (2d) 575; *22 Jan G. J. Boissevain, 17 T.C. 325. If the indebtedness was not proximately related to petitioner's trade or business at the time it became worthless, it is deductible only as a nonbusiness bad debt. In support of his position, that from 1928 through 1944 he was engaged in the business of promoting run-down newspapers, the petitioner urges that his activities were such as to bring him within our holding in Vincent C. Campbell, 11 T.C. 510, and similar cases. As was pointed out in Charles G. Berwind, supra, the authority contained in the Campbell case and similar cases is applicable only to exceptional situations where the taxpayer's activities in promoting, financing, managing and making loans to a number of corporations have been regarded as so extensive as to constitute a business separate and distinct from the business carried on by the corporations themselves. During the period 1928 through 1944, the petitioner was an officer of Brownsville from 1928 to 1941, an officer of Philadelphia from 1934 to 1940, and an officer of Pioneer from 1941 to 1944. However, petitioner's stock interest in, and connection with, Brownsville and Philadelphia *23 were terminated prior to the time he acquired the stock of Pioneer and became an officer of it. From 1929 to 1939 the petitioner was an employee of Lord & Thomas to whose business he appears to have devoted almost all of his business hours. From 1939 through 1944 he was an officer of Hickerson, Inc. While certain of petitioner's testimony is to the general effect that he made loans to Brownsville and Philadelphia, such testimony is not corroborated by the minutes of the meetings of the stockholders and directors of those corporations, which he placed in evidence as support of his testimony respecting his activities as to those corporations, nor is it corroborated by anything else of record. Under these circumstances, we think any loans petitioner may have made to those corporations were so nominal as to be inconsequential for present purposes. In view of this, and since the petitioner testified that he was not in the business of loaning money, the only loans of significance made by him appear to have been those made to Pioneer. From the foregoing, it is apparent that the petitioner's activities with respect to Brownsville, Philadelphia and Pioneer lacked the extensiveness necessary *24 to bring them within the Campbell case, where it was shown that from 1929 through 1944 the taxpayer had organized, operated and financed 12 corporations. In Burnet v. Clark, 287 U.S. 410, the Supreme Court made it plain that the business of a corporation is not the business of its stockholders and officers. Also see Commissioner v. Smith (C.A. 2), 203 Fed. (2d) 310; certiorari denied 346 U.S. 816. Consequently, the petitioner can not appropriate to himself as his own business the business conducted by the corporations of which he was a stockholder and officer. From June 1942 through 1944 the petitioner owned The Bethesda Journal which he operated as his individual business and from which he reported income in his income tax returns for 1943 and 1944. Some uncorroborated statements of the petitioner are to the effect that between the time he purchased that newspaper and the end of 1944 he made a number of cash advances with respect to it. So far as appears, any advances so made were used solely in the business of that newspaper and none were advanced or loaned by or through it to any other enterprise. Under these circumstances, and since petitioner *25 was the owner of the newspaper and operated it as his business, it is obvious that such advances did not serve to put him in the business of making loans. Such advances merely constituted the use by petitioner of his individual funds in his individual business. So far as appears, any use made by Hickerson, Inc., of The Bethesda Journal and the newspaper owned by Pioneer as test markets for newspaper advertising was made under separate arrangements with each, and under which arrangements each newspaper operated separately from and, independently of, the other. Pioneer discontinued the publication of its newspaper in 1943. Consequently, in 1944 it was not available to Hickerson, Inc., or anyone else, for advertising purposes. Stuart Bart, 21 T.C. 880, relied on by petitioner does not aid him here. There, the taxpayer, as a sole proprietor, was engaged in business as an advertising agent. From time to time, and in order to retain their business, he made advances to clients to enable them to pay their operating expenses. An advance made to one of his clients became bad during a year when the taxpayer was still engaged in such operations. On the facts presented, we held *26 that the bad debt there involved was not a nonbusiness bad debt because it was proximately related to the business conducted by taxpayer during the year it became worthless. Clearly, the factual situation there is unlike that presented here. As was said in Estate of Theodore Gutman, 18 T.C. 112, to escape classification as a nonbusiness bad debt, a debt and the loss from its worthlessness must bear a proximate relation to a business in which the taxpayer is engaged at the time the debt becomes worthless. From the facts established here, we fail to find a proximate relationship of Pioneer's indebtedness to petitioner to any business in which petitioner was engaged in 1944 when the indebtedness became worthless. The respondent's determination that such indebtedness constituted a nonbusiness bad debt is sustained. Decision will be entered for the respondent.